**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-137-RC** |
| **BRIAN GUNDERSEN,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. The government requests that this Court sentence Brian Gundersen to 46 months' incarceration, in the middle of the Sentencing Guidelines range as calculated by the government and the Probation Office; three years of supervised release; $2,000 in restitution; and a mandatory $200 special assessment. Such a sentence would reflect the gravity of Gundersen's conduct, his lack of remorse, and the need to deter him and others from similar conduct.

**I.     INTRODUCTION**

Gundersen was an eager and repeated participant in the Capitol Breach, a violent attack on the United States Capitol that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Gundersen came to the Capitol, not for a peaceful protest, but expecting to "bum rush the white house and take it over." Gundersen approached the Capitol, already aware that rioters had broken in. He shouted at police officers and entered the Capitol twice. After leaving the Capitol for a second time, he remained in the mob of rioters, trying to reenter the building. After these attempts proved unsuccessful, he assaulted one of the police officers trying to clear rioters out of the Northwest Courtyard. After the riot, rather than feeling remorse, Gundersen was proud of his actions. He justified his "resort to violence" and called himself and the other rioters "heroes" and "patriots" who tried to "take over the government" by "bum rushing the capitol building."

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  The January 6, 2021, Attack on the Capitol

The government incorporates by reference the details of the attack in the Statement of Facts from Gundersen's trial (ECF No. 44) for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### *Breach of the Capitol Building at the Northwest Courtyard*

Two of the main breach points through which rioters entered the Capitol Building on January 6 were entryways on the west side of the Senate Wing, off the Northwest Courtyard of the Capitol ("Senate Wing Door"). One entrance, a door with windows on either side, was the Senate Wing Door. Nearby was a fire door near the Senate Parliamentarian's Office.

In Images 1 and 2 below, the Senate Wing Door is circled in red, and the Parliamentarian Door is circled in blue.



*Image 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525*



*Image 2: Screenshot from open source video depicting Senate Wing Door and Parliamentarian Door as they appeared at about 2:13 pm on January 6, 2021*

About 1:48 p.m., rioters on the West Plaza broke through a police line at the base of the Northwest Scaffolding and climbed the steps underneath leading to the Upper West Plaza. Rioters

3

under the Northwest Scaffolding were stopped temporarily by police, but at about 2:09 p.m., they broke through and streamed up the stairs to the Northwest Courtyard. Many of these rioters headed straight towards the Senate Wing Doors.

About 2:13 p.m., a rioter broke the windows next to the Senate Wing Door using a stolen police riot shield. Rioters entered through those windows and opened the Senate Wing Door from the inside.



*Image 3: Screenshot from open source video at about 2:13 p.m.*



*Image 4: Screenshot from USCP Security Footage at about 2:13 p.m.*

Rioters began streaming into the building through the main door and the surrounding windows. Broken glass littered the ground, and a piercing alarm sounded, audible to anyone in the

area.

About 2:40 p.m., the rioters began attacking the Parliamentarian Door. Soon after, a rioter

broke a window in the door and opened it from the outside. *See* Exhibit 1 at 0:08.[2]



*Image 5: Screenshot from Exhibit 1 at 0:08*

Officers tried to stop rioters from entering but were soon overrun.



*Image 6: Screenshot from Exhibit 1 at 0:25 (Gundersen indicated with red box)*

Officers did not secure the door again until about 3:02 p.m., almost half an hour later.

### B.  Gundersen's Role in the January 6, 2021, Attack on the Capitol

---

[2] Exhibit 1 is an excerpt from Capitol security video. Because of problems with the original
recording, video from the lower half of the screen periodically suffers from interference.

Gundersen played an extended role in the January 6 attack on the Capitol. Before the attack, Gundersen made clear he was not coming to Washington for a peaceful protest. On January 5th, Gundersen asked on Facebook whether anyone else was "going to DC on the 6th" and suggested "we might be able to bum rush the white house and take it over" (ECF No. 44, at 5). Gundersen drove with his mother from Pennsylvania to attend the rally. While there, Gundersen heard that rioters had broken into the Capitol. Rather than stay away, he joined the crowd walking towards the Capitol (*id.*).

Gundersen entered the Capitol grounds from the west, walking through the West Plaza. While there, Gundersen saw fallen barricades and rioters fighting with police on the West Plaza (*id.*). About 2:26 p.m., Gundersen walked under the scaffolding set up for the Inauguration and joined a mass of rioters climbing the Northwest Steps. *See* Exhibit 2; *see also* Image 1 (yellow circle).



*Screenshot from Exhibit 2 at 0:11*

At the top of the Northwest Steps, Gundersen entered the Northwest Courtyard and moved directly to a window to the left of the Senate Wing Door which had been broken by rioters.

Gundersen tried to enter the building through the window but was ordered back by a USCP officer. Gundersen remained perched in the windowsill, banging his hand on the windowsill and shouting at USCP officers, before stepping back down and returning to the Northwest Courtyard. *See* Exhibit 3.



*Screenshot from Exhibit 3*

Soon after, at about 2:40 p.m., rioters broke through the nearby Parliamentarian Door. Within seconds, Gundersen jumped over a staircase railing and joined the first group of rioters rushing through the opened door. *See* Exhibit 4.



*Screenshot from Exhibit 4*

As he entered, Gundersen saw the rioters ahead of him fighting with police. *See* Ex. 1 at 0:25.



*Screenshot from Exhibit 1 at :25*

As rioters continued their confrontation with police, Gundersen encouraged more rioters to enter, waiving them in and patting them on the back as they entered. *See* Exhibit 5.

8



*Screenshot from Exhibit 5 at :47*

Gundersen next entered the nearby Parliamentarian's office. *See* Ex. 5 at 2:17. He stayed inside for about a minute, then exited the office and watched as additional rioters entered the building. After about two minutes, Gundersen walked down the hall towards the police line. *See* Ex. 5 at 2:52 – 4:00. Gundersen re-entered the Parliamentarian's office through a different door, emerging again through his original entry door. *See* Ex. 5 at 8:17. While inside the office, Gundersen saw rioters ransacking the room, wrecking furniture, stealing items, and throwing papers to the floor. *See* Exhibit 6. Video taken later of the Parliamentarian's office showed the full extent of the damage. *See* Exhibit 7.





*Screenshot from Exhibit 6*                    *Screenshot from Exhibit 7*

9

While inside the Parliamentarian's Office, Gundersen left a note on a desk expressing mock remorse: "sowwy for damage [crying emoticon]." ECF No. 44, at 13.



*Image 5: Photograph from Parliamentarian's Office*

After leaving the Parliamentarian's office for the second time, Gundersen moved north through the building. *See* Ex. 5 at 8:19-8:53. He entered another office and made a victory sign to rioters still outside. *See* Exhibit 8.



*Screenshot from Exhibit 8 at 0:01*

After exiting the office, Gundersen continued towards the North Door. *See* Image 1 (orange circle). The rioters' progress was temporarily delayed by a police line near the North Door. *See* Exhibit 9. At about 3:01 p.m., rioters broke through this police line and Gundersen joined the mob moving past the North Door. *See* Ex. 9 at 0:24- 0:30.



*Screenshot from Exhibit 9 at 0:26*

Gunderson was stopped by police, and at about 3:07 p.m., returned to the North Door and exited the building. *See* Exhibit 10.



*Screenshot from Exhibit 10*

After exiting, Gundersen immediately returned to the Northwest Courtyard. After retrieving his hat, jacket, and backpack, Gundersen re-entered the building by climbing through the Senate Wing Door window through which he had attempted to enter earlier. *See* Exhibit 11.

11



*Screenshot from Exhibit 11*

Shortly after entering the Capitol for the second time, Gundersen was forced out again by USCP and Metropolitan Police Department ("MPD") officers. Gundersen remained in the Northwest Courtyard for another hour, joining with other rioters trying to get into the building. *See* Exhibit 12.



*Screenshot from Exhibit 12*

12

At about 4:20 p.m., USCP and MPD officers were clearing rioters out of the Northwest Courtyard. Gundersen was forced to move away from the Senate Wing Door, toward the area known as the Northwest Terrace. *See* Image 1.



*Image 7: Screenshot from body-worn camera at about 4:21 p.m.*

On the Northwest Terrace, Gundersen joined a group of rioters confronting the police. As other rioters fought with police officers, Gundersen came out from behind another rioter and rushed MPD officer C.B., pushing into officer C.B. with his left arm. Another officer came to officer C.B.'s defense and pushed Gundersen away. *See* Exhibit 13.



*Screenshot from Exhibit 13*

13

After being pushed away, Gundersen beat his chest with his fists and retreated back into the crowd.



*Screenshot from Exhibit 13*

Gundersen then moved to a lower level of the Northwest Terrace, where another line of police had formed to hold back rioters. Gundersen stepped up to the front line of rioters facing police and stayed there until the police line moved forward, forcing the rioters to leave the area.



*Image 8: Screenshot from body-worn camera at about 4:25 p.m.*

### *Injuries*

Although Officer C.B., the assault victim in this case, did report any physical injuries from Gundersen's assault, the defendant's participation in this riot aided those rioters who did succeed in injuring officers and destroying property. His violent conduct served to incite and embolden

14

other violent rioters around him.

### C.  Gundersen's Lack of Remorse

Gundersen did not regret his actions on January 6. Quite the contrary. On January 7, 2021, Gundersen posted to social media a photograph of Members of Congress taking cover during the attack on the Capitol, along with the message, "Look at these scared little bitches."



Later, Gundersen called himself and the other rioters "patriots" who had been "mad enough to attack the government."

> **Author**  Brian Kristopher (Facebook: 1332145044)
> **Sent**  2021-01-07 21:44:02 UTC
> **Body**  i dont want to be arrested, i dont want any problems with the law, but for me to condemn my fellow patriots for being mad enough to attack the government would make me a spineless pussy

Gundersen also joked, "we can check bum rushing the capitol building off the list of potential ways to take over the government."

**Author** Brian Kristopher (Facebook: 1332145044)
  **Sent** 2021-01-07 21:48:28 UTC
  **Body** we can check bum rushing the capitol building off the list of
  potential ways to take over the government

Gundersen said he regretted the "over the top" violence, not because it was wrong, but because it would make the former President look bad.

**Author** Brian Kristopher (Facebook: 1332145044)
  **Sent** 2021-01-07 03:19:39 UTC
  **Body** in retrospect I kind of regret the over the top violence of today,
  not because it wasnt justified, but because It think it might have
  given them more ammo to disparage Trump with

Gundersen acknowledged that the former President had sent an angry mob to the Capitol and suggested that the former President's mistake had been not joining the mob himself to "make sure things went the way he intended."

**Author** Brian Kristopher (Facebook: 1332145044)
  **Sent** 2021-01-07 22:57:02 UTC
  **Body** I love Trump but he should have been more involved in our march
  to make sure things went the way he intended

**Author** Brian Kristopher (Facebook: 1332145044)
  **Sent** 2021-01-07 22:57:54 UTC
  **Body** if you want something done right do it yourself, don't just send an
  angry mob to the capitol building and expect them to behave when
  their entire world is being attacked

On January 8, 2021, Gundersen posted, "We all stormed the us capital *[sic]* and tried to take over the government," followed by, "We failed but fuck it."

**Author** Brian Kristopher (Facebook: 1332145044)
  **Sent** 2021-01-08 06:21:31 UTC
  **Body** we all stormed the us capital and tried to take over the
  governmnet

**Author** Brian Kristopher (Facebook: 1332145044)
  **Sent** 2021-01-08 06:21:37 UTC
  **Body** we failed but, fuck it

16

Later, Gundersen justified the attack by suggesting that the members of Congress deserved

it, and called himself and the other rioters "heroes":

> **Author** Brian Kristopher (Facebook: 1332145044)
> **Sent** 2021-01-08 06:26:52 UTC
> **Body** they care about no one except themselves, the couple hundred of them
>
> **Author** Brian Kristopher (Facebook: 1332145044)
> **Sent** 2021-01-08 06:27:04 UTC
> **Body** hence why we tries to take them down
>
> **Author** Brian Kristopher (Facebook: 1332145044)
> **Sent** 2021-01-08 06:27:30 UTC
> **Body** i guess we are the only heroes on this world

A few minutes later, Gundersen justified the "resort to violence" again:

> **Author** Brian Kristopher (Facebook: 1332145044)
> **Sent** 2021-01-08 06:31:23 UTC
> **Body** they dont listen to us
>
> **Author** Brian Kristopher (Facebook: 1332145044)
> **Sent** 2021-01-08 06:31:29 UTC
> **Body** so we had to resort to violence

And Gundersen referred to the attack as "a righteous crusade for freedom."

**Author** Brian Kristopher (Facebook: 1332145044)
**Sent** 2021-01-08 08:22:58 UTC
**Body** Do you think we didn't go far enough, or did we go too far

**Author** Brian Kristopher (Facebook: 1332145044)
**Sent** 2021-01-08 08:23:13 UTC
**Body** could we have done more if we took over the building

**Author** Brian Kristopher (Facebook: 1332145044)
**Sent** 2021-01-08 08:23:42 UTC
**Body** idk what more we could have done

**Author** Brian Kristopher (Facebook: 1332145044)
**Sent** 2021-01-08 08:32:51 UTC
**Body** *sigh*

**Author** Brian Kristopher (Facebook: 1332145044)
**Sent** 2021-01-08 08:33:10 UTC
**Body** when i say we i dont mean "us" in this group

**Author** Brian Kristopher (Facebook: 1332145044)
**Sent** 2021-01-08 08:33:53 UTC
**Body** but its hard for me to condemn people on a righteous crusade for freedom

### D.  Gundersen's False Statements On Social Media

Though proud of his actions, Gundersen knew he had broken the law and was worried about being arrested. Concerned about being turned in to law enforcement, Gundersen adopted a strategy of lying about and minimizing his conduct at the Capitol.

For example, on January 7, 2021, recognizing that it would look better if he had not gone inside the building, Gundersen claimed he was only on the steps of the Capitol.

**Author** ██████████████████████████
**Sent** 2021-01-07 19:28:11 UTC
**Body** Did you go in thr capitol??!?!?!

**Author** Brian Kristopher (Facebook: 1332145044)
**Sent** 2021-01-07 19:28:21 UTC
**Body** no but i was on the steps

On January 10, 2021, recognizing that the FBI would be interested in his activities at the Capitol, Gundersen falsely stated that he did not go inside the building and did not engage in violence

18

**Author** Brian Kristopher (Facebook: 1332145044)
**Sent** 2021-01-10 01:58:54 UTC
**Body** yes im hiding in the closet, they'll never find me, muahahahahah

**Author** Brian Kristopher (Facebook: 1332145044)
**Sent** 2021-01-10 01:59:08 UTC
**Body** *its a joke fbi*

**Author** Brian Kristopher (Facebook: 1332145044)
**Sent** 2021-01-10 01:59:37 UTC
**Body** I was outside the building not inside btw

**Author** Brian Kristopher (Facebook: 1332145044)
**Sent** 2021-01-10 01:59:56 UTC
**Body** no violence from me

And on January 13, 2021, when a friend reported seeing Gundersen on the news, Gundersen worried about his name being disclosed and falsely claimed he had not entered the building.

**Author** ████████████
**Sent** 2021-01-13 04:03:30 UTC
**Body** Dude you were on news 12

**Author** Brian Kristopher (Facebook: 1332145044)
**Sent** 2021-01-13 05:01:23 UTC
**Body** how do u know

**Author** ████████████
**Sent** 2021-01-13 05:01:53 UTC
**Body** I saw it on tv

**Author** Brian Kristopher (Facebook: 1332145044)
**Sent** 2021-01-13 05:02:18 UTC
**Body** dont tell anyone

**Author** ████████████
**Sent** 2021-01-13 05:02:22 UTC
**Body** Ok

**Author** Brian Kristopher (Facebook: 1332145044)
**Sent** 2021-01-13 05:02:26 UTC
**Body** did it say my name

**Author** ████████████
**Sent** 2021-01-13 05:02:29 UTC
**Body** No

**Author** Brian Kristopher (Facebook: 1332145044)
**Sent** 2021-01-13 05:02:43 UTC
**Body** i didnt enter the building so i should be fine

Gundersen told another friend he would falsely deny having been at the Capitol.

> **Author** Brian Kristopher (Facebook: 1332145044)
> **Sent** 2021-01-13 06:04:25 UTC
> **Body** from now on im just going to deny being there
>
> **Author** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
> **Sent** 2021-01-13 06:04:39 UTC
> **Body** U went to dc?
>
> **Author** Brian Kristopher (Facebook: 1332145044)
> **Sent** 2021-01-13 06:04:55 UTC
> **Body** no

After the riot, Gundersen spoke to someone putting together a documentary, identified the clothes he wore to the Capitol, admitted having been "rowdy," and implored the person not to identify ("dox") him in the documentary.

> **Author** Brian Kristopher (Facebook: 1332145044)
> **Sent** 2021-01-13 05:26:59 UTC
> **Body** i was wearing a red maga hoodie so try not to dox me in your documentary please
>
> **Author** Brian Kristopher (Facebook: 1332145044)
> **Sent** 2021-01-13 05:27:13 UTC
> **Body** earlier i was also wearing my football jacket
>
> **Author** Brian Kristopher (Facebook: 1332145044)
> **Sent** 2021-01-13 05:27:27 UTC
> **Body** i was rowdy but i wasnt antifa

On January 15, 2021, Gundersen lied about having merely gone up to the steps and then turned around. He expressed concern that he could lose his job.

> **Author** Brian Kristopher (Facebook: 1332145044)
> **Sent** 2021-01-15 05:16:21 UTC
> **Body** i didnt trespass
>
> **Author** Brian Kristopher (Facebook: 1332145044)
> **Sent** 2021-01-15 05:16:52 UTC
> **Body** i got up to the steps and then turned around
>
> **Author** Brian Kristopher (Facebook: 1332145044)
> **Sent** 2021-01-15 05:18:07 UTC
> **Body** did you drop my name or something
>
> **Author** Brian Kristopher (Facebook: 1332145044)
> **Sent** 2021-01-15 05:18:36 UTC
> **Body** I don't want to lose my job

### E.      Gundersen's False Statements to the FBI

On January 19, 2021, FBI agents visited Gundersen at his home for a voluntary interview. Consistent with his social media posts, Gundersen lied to the FBI, claiming he did not go inside the Capitol and was only close to the building because he was pushed up the steps by the crowd. During a subsequent interview that day, Gundersen admitted going inside the building but still falsely claimed that he was pushed by the crowd and did not enter any offices. Gundersen also falsely claimed he did not participate in or witness any violence.

Gundersen was arrested on January 25, 2021. During a post-*Miranda* interview, Gundersen told law enforcement officials that on January 6, he was at the rally when he heard someone say, "they breached the Capitol Building." He then walked to the Capitol. Gundersen said he entered an office that he thought might have belonged to Nancy Pelosi. He recalled there were things broken when he entered and described the scene as "chaos." Gundersen admitted that while inside this office, he wrote a message on a notepad saying he was sorry for the damages.

## III.     THE CHARGES AND VERDICT

On May 26, 2021, a federal grand jury returned a superseding indictment charging Gundersen with eight counts, including Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count One) and Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (Count Two). On November 9, 2022, Gundersen was convicted after a trial on stipulated facts on Counts One and Two.

## IV.     STATUTORY PENALTIES

Gundersen now faces sentencing on Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count One) and Assaulting, Resisting, or Impeding Certain Officers, in

violation of 18 U.S.C. § 111(a)(1) (Count Two).

As noted by the plea agreement and the Presentence Investigation Report issued by the U.S. Probation Office, the statutory maximum term of imprisonment is 20 years on Count One (Obstruction of an Official Proceeding) and eight years on Count Two (Assaulting, Resisting, or Impeding Certain Officers). PSI ¶¶ 101-02.

The maximum fine for Counts One and Two is $250,000, as to each. PSI ¶ 121.

The maximum terms of supervised release are three years for Counts One and Two. PSI ¶ 106.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

### 1.    Guidelines Analysis for Each Count

The government agrees with the Sentencing Guidelines calculation set forth in the PSI, and analyzes the guidelines for each count as follows:

**Count One: 18 U.S.C. § 1512(c)(2) and § 2—obstructed and aided and abetted the obstruction of an official proceeding before Congress**

| Base offense level: | 14 | U.S.S.G. §2J1.2(a) |
|---|---|---|
| Special offense characteristic | +8 | U.S.S.G. §2J1.2(b)(1)(B): "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." |
| Special offense characteristic | +3 | U.S.S.G. §2J1.2(b)(2): "the offense resulted in substantial interference with the administration of justice." |
| Total | 25 | |

**Count Two: 18 U.S.C. § 111(a)(1) – assaulting, resisting, or impeding certain officers**

| Base Offense Level: | 14 | U.S.S.G. §2A2.2(a) |
|---|---|---|
| Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)." |
| Total | 20 | |

22

### 2.      Grouping Analysis

Under U.S.S.G. §3D1.2(a) and (c), "closely related counts" group. Counts One and Two should be placed into one group, because the assault charged in Count Two is embodied in the 8-level increase in the offense level for Count One under U.S.S.G. § 2J1.2(b)(1)(B): "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice."

The highest offense level for the group is 25 (for Count One).

The government agrees that a three-level reduction under U.S.S.G. § 3E1.1(a) is appropriate. *See* PSI at ¶¶ 69, 69a.

The U.S. Probation Office calculated Gundersen's criminal history as a category I, which the government does not dispute. *See* PSI ¶ 73. Accordingly, the U.S. Probation Office correctly calculated Gundersen's total offense level at 22, and his corresponding Guidelines imprisonment range at 41-51 months. *See* PSI ¶ 103.

## VI.      SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Gundersen's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The nature and circumstances of Gundersen's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 46 months

23

of incarceration.

**B.      Gundersen's History and Characteristics**

In 2014, Gundersen was arrested for breaking and entering a dwelling when the resident was home, resulting in a 2016 conviction for Willful Trespass, for which he was sentenced to one year of probation. PSI ¶ 72. Unlike many of the January 6 defendants who pled guilty quickly and demonstrated extraordinary remorse, Gundersen has lied about and minimized his actions, and did not accept responsibility for his actions until approximately 18 months after he was charged.

The PSI notes that in the past, Gundersen was diagnosed with various mental health conditions, and suggests this may be a basis for a downward departure under USSG § 5H1.3 (PSI ¶ 128). But the medical records provided to the government by the defense also show that his conditions are not extraordinary, and are being well treated with medication. *See generally United States v. Maldonado-Montalvo*, 356 F.3d 65, 74-75 (1st Cir. 2003) (district court erred in finding defendant's mental condition extraordinary where medications were effective). In addition, the defense has provided no evidence that Gundersen was seeking treatment for mental health problems shortly before January 6, 2021, or that he continued to seek treatment after April 8, 2021. And the medical records show Gundersen made progress even over this short time period. The April 8, 2021 report states that "his mood has been stable with no depression" and that Gundersen reports his mood as "euthymic and stable." Nor has the defense presented any evidence that imprisonment would impact Gundersen's ability to obtain necessary treatment.

As relates to sentencing, there is no evidence that Gundersen's mental health issues caused, or were in any way related to, his actions at the Capitol. The defense has provided no evidence that Gundersen's mental health issues made him susceptible to mob influence or diminished his

24

capacity to appreciate the nature of his conduct. To the contrary, the evidence shows that Gundersen's actions at the Capitol were self-directed and that he was not merely following or repeating the behavior of other rioters. The social media posts described above show that Gundersen understood exactly why he went to the Capitol, what he wanted to achieve, and that he would face legal consequences for his actions. Additional social media posts, contained in Exhibit 14, demonstrate Gundersen's sophisticated vocabulary and high opinion of himself. *See* Exhibit 14, at 1, 3. Indeed, Gundersen believes he has "creativity and passion that many lack" and "better genetics than most of the population." Ex. 14 at 1, 3. Gundersen also has no difficulty expressing his peculiar beliefs about race and politics and knows that because of these beliefs, some might think him "an evil person." Ex. 14, at 3. These posts show that regardless of any mental health issues, Gundersen should be fully answerable for his own actions. *See generally United States v. Barton,* 76 F.3d 499, 502 (2d Cir. 1996) (vacating § 5H1.3 departure where defendant's sense of morality remained intact, and "[h]e appreciate[d] both the societal and moral constraints of his behavior").

Accordingly, while potentially relevant in determining the conditions of supervised release, Gundersen's mental health conditions do not support a reduced sentence. Blaming Gundersen's actions at the Capitol on mental health issues would unfairly contribute to the stigma surrounding mental illness and unjustly relieve him of personal responsibility.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a significant sentence of incarceration. Gundersen's eager participation in the riot, entering the Capitol twice, invading Senate offices, and assaulting a police officer, was the epitome of disrespect for the law.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration.

Although Gundersen has a criminal history category of I, his prior conviction for willful trespass, based on an original charge of breaking and entering, demonstrates a disrespect for the law that was on full display at the Capitol on January 6. Moreover, his social media statements after January 6 demonstrate not only a lack of remorse, but a deep-seated belief that violence is justified in the service of one's political goals.

**E.     The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying

---

[3]  *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

## F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of

sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases in which the defendant was convicted of both a violation of Section 1512(c)(2) and Section 111(a)(1) provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Scott Fairlamb*, 21-cr-120-RCL, as part of his obstructive conduct, the defendant assaulted an officer by shoving him and punching him in his face shield. Judge Lamberth sentenced Fairlamb to 41 months of imprisonment. While Fairlamb brandished a stolen police baton, he did not use it, and Gundersen's conduct was more egregious because he entered the Capitol twice, while Fairlamb did not enter the Capitol at all. Moreover, Fairlamb demonstrated extraordinary acceptance of responsibility by pleading guilty shortly after he was charged; Gundersen did not.

In *United States v. Duke Wilson*, 21-CR-345-RCL, the defendant attacked police officers, attempting to take their shields, and throwing objects at them. Wilson also tried to keep an entrance door open so that rioters could further engage officers. Judge Lamberth sentenced Wilson to 51 months of imprisonment. Unlike Gundersen, however, Wilson did not enter the Capitol itself.

The government submits that given these similar cases, a mid-guideline range sentence of 46 months of imprisonment for Gundersen would not create an unwarranted sentencing disparity.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

authority to order restitution to victims of most federal crimes."[4] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).

Those principles have straightforward application here. The victim in this case, Officer C.B., did not suffer bodily injury as a result of Gundersen's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Gundersen must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Gundersen played in the riot on January 6.[5] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Gundersen's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 125.

---

[4] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[5] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## <u>CONCLUSION</u>

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 46 months incarceration, three years of supervised release, restitution of $2,000, and a mandatory $200 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052


BY:    */s/  Robert Juman*
        ROBERT JUMAN
        Assistant United States Attorney
        Bar No. NJ 033201993
        United States Attorney's Office, Detailee
        555 Fourth Street, N.W.
        Washington, DC 20530
        Phone: (786) 514-9990
        E-mail: Robert.juman@usdoj.gov