**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Crim. Action No. 1:21-CR-137 (RC) |
| BRIAN GUNDERSEN, | |
| Defendant. | |

## MEMORANDUM IN AID OF SENTENCING

The question most often asked about January 6th is "how could this happen?"
And at the core of this Court's analysis in determining Mr. Gundersen's history and
characteristics is determining "how Mr. Gundersen could have done this?"   Mr.
Gundersen faces sentencing before the Court having been convicted of two serious
felonies and he continues to ask himself, "How did this happen?"  But for an impartial
observer, the pieces fall quickly into place. ███████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████

Conversations with Mr. Gundersen reveal a childlike man with stunted
emotional growth.  He inappropriately or irrelevantly inserts anime and Pokemon

into his conversations.  He discusses his peers and relationships like a pre-pubescent child.  And his online persona is braggadocious and blustery to help conceal the shortcomings that he believes are obvious to everyone.  ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

Viewed through this lens, Mr. Gundersen's January 6th makes significantly more sense.  It makes sense that he was identified because he was wearing his high school football jacket – even though he was almost 27 years old. Exhibit A at 12 ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████  It also makes sense that he wrote a puerile note and engaged in online bragging after January 6th.  Exhibit A at 15 ███████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

Mr. Gundersen's circumstances around January 6, 2021 also contributed to what happened.  He and his mother had moved to Pennsylvania in September 2020 during the COVID pandemic.  Between the move, new insurance and restrictions on in-person appointments██████████████████████████████████████████

████████████████████████████████████████████████

Exhibit A at 16.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

But Mr. Gundersen has demonstrated on pretrial release that he is capable of improving himself.  He is appropriately remorseful, telling the Court, "This ordeal has weighed heavy on my mind every day every time I go to sleep, but I have been working ████████████ to try and collect the pieces and build myself into a better person.  I hope that this monologue has at least given context to why I acted the way I did, and I hope that you can believe me that I am not an evil person and that the foolish person I was on January 6th is not who I want to be."  Exh. B. at 2.

Still, the Presentence Report (PSR) guideline range is excessive and Mr. Gundersen's conduct does not warrant anywhere near the 46 month sentence proposed by the government.  Mr. Gundersen did not travel to the Capitol with weapons, armor or a plan to commit violence.  He did not travel or organize with any extremist groups.  He was not among the first to breach the Capitol and while he purposefully jumped into a riot shield and "beat [his] chest like Donkey Kong from the video game Super Smash Brothers" he did not injure anyone and immediately

apologized to another officer.  Exh. B at 2.  The government's request for such a draconian sentence appears to be based largely on the words—admittedly, reprehensible words—that Mr. Gundersen posted online, shouting into the void, bragging about "bum rushing the white house."  In our criminal legal system, we punish people for their actions, not for their use of attention-seeking rhetoric, especially when the behavior ███████████████████████. And in looking at Mr. Gundersen's actions, counsel respectfully submits that the government's request—as well as the PSR's guideline range—substantially exaggerates Mr. Gundersen's conduct.

Finally, Mr. Gundersen has also been ████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████ And though he has had difficulty finding employment both because of his presentation and also because of his participation in January 6th, he has become resolute in finding employment that would help him serve his community.

Mr. Gundersen's life, since he was about eight years old, has been filled with mitigating circumstances.  He thus requests a downward departure, or in the alternative, a variance, and requests a sentence of three years of probation.

Pursuant to 18 U.S.C. § 3553(a), Rule 32 of the Federal Rules of Criminal Procedure, and Section 6A1.3 of the advisory United States Sentencing Guidelines ("USSG"), Mr. Gundersen states that he has reviewed the PSR and offers the following objections: The PSR wrongly assesses a total 11-level increase under § 2J1.2

even though Mr. Gundersen's conduct did not involve the substantial interference with the "administration of justice" nor was it intended to interfere with the "administration of justice."

Therefore, Mr. Gundersen respectfully submits that the correctly-calculated offense level is 12, resulting in a guideline range of 10-16 months[1]. Application of the sentencing factors demonstrate that a sentence of no more than probation is sufficient but no greater than necessary to achieve the goals of sentencing.

I.    **Objections to PSR**

   A. **The PSR incorrectly applied the U.S.S.G. §2J1.2 specific offense characteristics.**[2]

The PSR added eleven levels to Mr. Gundersen's total offense level for two instances of interference with the "administration of justice" under U.S.S.G. §2J1.2(b). For the reasons set forth in the Honorable Judge McFadden's opinion on this issue[3], the application of these enhancements is a legal error and factual error.

The relevant specific offense characteristics provide as follows:

---

[1] Under §93D1.1(b), Counts One and Two group. Under either applicable guideline—2J1.2(a) or 2A2.2(a)—the base offense level is 14. Mr. Gundersen receives a 2-level reduction for acceptance of responsibility resulting in a total offense level of 12.

[2] Undersigned counsel is aware that this Court applied the administration of justice enhancements in *United States v. Reffitt*, 1:21CR32 (DLF). Undersigned counsel's review of the dockets reveals that the issue was not fully briefed before this Court. In any event, counsel respectfully objects to the application of the enhancement based on the facts of Mr. Gundersen's case, the plain text of 2J1.2(b), the guidelines commentary, and judicial interpretation of the enhancement.

[3] Rather than summarizing Judge McFadden's reasoning, undersigned counsel has attached Judge McFadden's Order as Exhibit C and incorporates it by reference.

> If the offense involved causing or threatening to cause physical injury to a person, or property damage, *in order to obstruct the administration of justice*, increase by 8 levels.

U.S.S.G. §2J1.2(b)(1)(B) (emphasis added).

> If the offense resulted in substantial interference *with the administration of justice*, increase by 3 levels.

U.S.S.G. §2J1.2(b)(2) (emphasis added).

The guidelines application note states that "substantial interference with the administration of justice" includes:

> a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources.

U.S.S.G. §2J1 cmt. n. 1.

Courts do not interpret the guidelines in a manner different from their interpretation of statutory text. *E.g.*, *United States v. Martinez*, 870 F.3d 870 F.3d 1163, 1166 (9th Cir. 2017) ("We interpret the Sentencing Guidelines using the ordinary tools of statutory interpretation."). Thus, the proper inquiry into meaning "will most often begin and end with the text and structure of the Guidelines." *Id.* "The language of the Sentencing Guidelines, like the language of a statute, must be given its plain and ordinary meaning." *United States v. Fulford*, 662 F.3d 1174, 1177 (11th Cir. 2011). Therefore, courts' construction of the phrase "administration of justice" as it appears in Title 18 should not differ from their interpretation of the same phrase in the guidelines. *Id.*

Here, there is no real debate. Every circuit that has addressed the question has

held that the phrase "administration of justice" refers to judicial proceedings. *United States v. Richardson*, 676 F.3d 491, 502-503 (5th Cir. 2012) ("[O]bstructing the due administration of justice means interfering with the procedure of a judicial hearing or trial."); *United States v. Brenson*, 104 F.3d 1267, 1279-80 (11th Cir. 1997) ("due administration of justice" means "judicial procedure" and "the performance of acts required by law in the discharge of duties such as appearing as a witness and giving thoughtful testimony when subpoenaed"); *United States v. Warlick*, 742 F.2d 113, 116 (4th Cir. 1984) (defining obstruction of the "administration of justice" as acts that "thwart the judicial process"); *United States v. Rasheed*, 663 F.2d 843, 851 (9th Cir. 1981) ("administration of justice" commences with "a specific judicial proceeding").

The aforementioned application note to U.S.S.G. §2J1.2(b) bolsters that commonsense reading. Every example of substantial interference with the "administration of justice" involves interference with an investigation or evidence. U.S.S.G. §2J1 cmt. n. 1.

Text aside, law-of-the-case and estoppel principles foreclose application of these specific offense characteristics. As the Court knows, January 6 defendants have filed dozens of motions to dismiss the § 1512(c)(2) charge and in front of every judge of this Court. One of their arguments was that Congress's joint session to count electoral votes does not constitute an "official proceeding" under that statute because, among other reasons, it did not involve the administration of justice. In response, the government contended that the joint session did not need to entail the administration of justice to constitute an "official proceeding." And in dozens of filings the

7

government all but conceded, that, in fact, the joint session did not administer justice. *See United States v. William Pepe*, 21-cr-52, ECF No. 55 (D.D.C. 2021), p. 8 n. 3 (government: "the certification of the Electoral College vote is not an 'inquiry or investigation'"); *United States v. Knowlton*, 21-cr-46, ECF No. 63 (D.D.C. 2021), p. 12 (government: "The 'proceeding before Congress' is not limited to proceedings solely related to the administration of justice."); *United States v. Nordean*, 21-cr-175, ECF No. 106 (D.D.C. 2021), p. 21 (government acknowledging that although § 1512(c)(2) had "never been applied" outside the context of the administration of justice, the "unprecedently brazen attack" on the Capitol justified application outside that context). The government's arguments on this score led the Court to positively hold that the joint session *does not administer justice. United States v. Montgomery*, 578 F. Supp. 3d 54 (D.D.C. 2021) ("Congress does not engage in . . . 'the administration of justice.'"); *see also United States v. Sandlin*, 575 F. Supp. 3d 16, 24 (D.D.C. 2021) ("[T]he Court will not read an 'administration of justice' requirement into 'official proceeding.'").[4]

Having denied defendants' dismissal motions that argued the joint session needed to, but did not, administer justice, the Court cannot find, under the same tools

---

[4] The government's arguments on this point appear to have evolved from a position that an official proceeding need not be "quasi-judicial" to arguing, as it has in this case, that the certification of the Electoral College vote does possess "tribunal-like" characteristics. ECF. No. 31 at 30. The government should not be permitted to walk back its earlier position that an "official proceeding" need not administer justice. It was the government's position and district judges relied on it to hold that January 6 defendants obstructed an "official proceeding." The substantial guidelines enhancement, however, should be reserved, as made clear in the plain text of the guideline, for those cases in which defendants obstructed judicial proceedings.

of interpretation, that "administration of justice" now means something different under the Guidelines. Under the law- of-the-case doctrine, "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case." *United States v. Carr*, 557 F.3d 93, 101 (2d Cir. 2009). The doctrine is "driven by considerations of fairness to the parties, judicial economy, and the societal interest in finality." *Id.*

Indeed, it would be contrary to due process to assume that the Sentencing Commission meant to include "official proceeding" though it did not include the phrase in Section 2J1.1. The Guidelines are interpreted using the same tools of construction that are employed in the interpretation of statutory text. *Martinez*, 870 F.3d at 1166; *Fulford*, 662 F.3d at 1177. The government and the defense alike cannot read words into the guidelines that the Commission did not include. Especially here, where reading words into the guideline results in an 11-level increase in the guideline range, which translates into *years* of a defendant's liberty.

Finally, it would be nonsensical to interpret "administration of justice" one way under the Guidelines and a different way in Title 18. It is not just that the interpretive tools are the same. *Martinez*, 870 F.3d at 1166; *Fulford*, 662 F.3d at 1177. It is that §2J1.2 was designed to sentence offenses under § 1503. U.S.S.G. §2J1.2 cmt Statutory Provisions. Section 1503 contains the exact same phrase, "administration of justice." Administratively, it would be chaotic for the phrases to hold different meaning.

## B.  §2J1.2(b)(1)(B) does not apply factually.

Mr. Gundersen has acknowledged that he jumped into the riot shield of an officer before beating his chest like Donkey Kong.[5] Government's Exhibit 13 captures the entirety of the interaction.

The government argues that Mr. Gundersen's guideline range should be enhanced under 2J1.2(b)(1)(B). Mr. Gundersen regrets and indeed immediately regretted his extremely poor judgment. Still, the guideline requires that his action both involved: 1) "causing or threatening to cause physical injury to a person"; and 2) "in order to obstruct the administration of justice." Neither factor is established by the facts of this case.

First, Mr. Gundersen's conduct, while technically an assault, was never a threat to cause any injury to officer C.B. He jumped into a riot shield initially. Then when the officer dropped the riot shield, Mr. Gundersen turned and walked away. His actions contradict the government's arguments that he was threatening to cause physical injury – when the opportunity arose, Mr. Gundersen withdrew.

Second, the enhancement doesn't apply because Mr. Gundersen did not jump into the officer's riot shield "in order" to obstruct the administration of justice. The guideline is clear that in order for the enhancement to apply, at a minimum, Mr. Gundersen must have destroyed the property *with an intent to obstruct the administration justice. See United States v. Calvert*, 511 F.3d 1237, 1240 (9th Cir. 2008)(recognizing that 2J1.2(b)(1)(B) "only applies where the defendant acts with an

---

[5] Donkey Kong is an adventurous video game gorilla known for throwing barrels and beating his chest.

10

intent to obstruction the administration of justice" and finding that defendant's intent to physically harm a witness in retaliation triggered the enhancement).

But as the government's memorandum acknowledges, Mr. Gundersen's assault on the police officer occurred *after* he left the Capitol building and he did not again enter after the encounter. And while Mr. Gundersen made a number of regrettable comments after January 6th, he did not say anything to suggest that he jumped into the riot shield in order to stop the certification of the vote, which, according to the government constitutes the "administration of justice." In fact, his intent was made very clear when he pounded his chest with his fists. And Mr. Gundersen states, "I was about to leave and stupidly wanted to do one last thing." Exh. B at 2.

### C. The aggravated assault enhancement does not apply.

The government implicitly argues that the aggravated assault guideline, USSG § 2A2.2, applies to Count 2, ECF No. 54 at 22, despite also acknowledging that the "victim in this case, Officer C.B. did not suffer bodily injury." ECF No. 54 at 30. A plain reading of the Guidelines shows that USSG § 2A2.4 applies (Obstructing or Impeding Officers) applies.[6]

The Sentencing Guidelines have separate guidelines for Aggravated Assault (§2A2.2), Assault (§2A2.3) and Obstructing or Impeding Officers (§2A2.4).

---

[6] Application Note 1 to 2A2.2 relevantly defines "aggravated assault" as "a felonious assault that involved a dangerous weapon with intent to cause bodily injury (i.e. not merely to frighten) with that weapon; or an intent to commit another felony. Neither of these prongs apply. As established in the statement of offense, Mr. Gundersen was not convicted of using a dangerous weapon with an intent to cause bodily injury or intent to commit another felony. Therefore, the aggravated assault guideline does not apply.

Meanwhile, the statute for assaulting officers, 18 U.S.C. § 111, includes three degrees of assault. For (simple) assault, the maximum punishment is not more than one year. For offenses that involve physical contact or the intent to commit another felony, the maximum punishment increases to eight years. Both circumstances are found in the same subsection as assault, 18 U.S.C. § 111(a). Congress wrote a separate subsection explicitly titled "Enhanced Penalty" that applies to offenses involving a dangerous weapon or bodily injury, *see* 18 U.S.C. § 111(b), and increases the statutory maximum to twenty years. In doing so, Congress made a clear distinction in both the structure of the statute and the escalating punishments. The only offenses that qualify for an "enhanced penalty" of up to twenty years in prison are those that involve a dangerous weapon or bodily injury. While physical contact and the intent to commit another felony make a defendant subject to a greater sentence than assault, those circumstances fall closer, both in penalty and text, to assault than to offenses involving a dangerous weapon or infliction of bodily injury. These distinctions, enacted by Congress, provide important context when determining the weight that should be afforded to the definitions of "aggravated assault" within the commentary to §2A2.2.

The commentary lists four categories of aggravated assault. Three of them are directly tied to the distinction Congress created within the statute itself – use of a dangerous weapon with intent to cause bodily injury, bodily injury, and strangulation. *See* USSG § 2A2.2, Application Note 1. The fourth category – intent to commit another felony – is an outlier because it is unrelated to an intent to commit

bodily injury. The Sentencing Commission simply elevated intent to commit another felony into the next more serious category despite the distinctions made by Congress within the statute itself. The Commission, then, made the "intent to commit another felony" prong of 18 U.S.C. § 111(a)(1) tantamount to the aggravated assault crimes contained in the "enhanced penalty" prong of 18 U.S.C. § 111(b), even though the statutory maximums for the different prongs vary by twelve years. Notably, and without explanation, the Commission did not elevate the "physical contact" prong of 18 U.S.C. § 111(a)(1). There is simply no justification for the Sentencing Commission to treat the two prongs of 18 U.S.C. § 111(a)(1) differently than each other, a clear contravention of the distinctions created by Congress. For these reasons, no deference should be given to the commentary that elevates the intent to commit another felony to an aggravated assault. The definition of aggravated assault can be determined directly by examining the relevant statute directly.

Under the appropriate Guideline, the official victim enhancement does not apply because it is incorporated into the base offense level of 10. Cmt. 2. Therefore, if the Court applies §2A2.4, the base offense level is 10 and under the grouping rules, the §2J1.2 applies.  chaos

### D.  The official-victim enhancement does not apply.

Alternatively, the PSR incorrectly applies a 6-level enhancement for official victim. The applicable guideline provides in full: (Apply the greatest):

> (a) If (1) the victim was (A) a government officer or employee; (B) a former government officer or employee; or (C) a member of the immediate family of a person described in subdivision (A) or (B); and (2) the offense of

conviction was *motivated by such status*, increase by **3** levels;

(b) If subsection (a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offense Against the Person), increase by **6** levels.

(c) *If, in a manner creating a substantial risk of serious bodily injury*, the defendant or a person for whose conduct the defendant is otherwise accountable –

(1) knowing or having reasonable cause to believe that a person was a law enforcement officer,  assaulted such officer during the course of the  offense or immediate flight therefrom; or

(2) knowing or having reasonable cause to believe  that a person was a prison official, assaulted such official while the defendant (or a person for whose conduct the defendant is otherwise accountable) was in the custody or control of a prison or other  correctional facility, increase by **6** levels.

USSG § 3A1.2 (italics added; bolded in original).

In the commentary, the Commission explains, in pertinent part, that "motivated by such status," means that the offense of conviction was motivated by the fact that the victim was a government officer or employee. *Id*. cmt. n.3. The Commission provides an example "where both the defendant and the victim were employed by the same government agency and the offense was motivated by a personal dispute." *Id*.

Thus, for the enhancement to apply under § 3A1.2(b), the defendant must have been motivated to act by the victim's status and not for some other reason. Mr. Gundersen acted impetuously and without thinking, characteristics that are common to those with his mental health profile.  He would have done the same if a rioter,

rather than an officer, had been holding the shield and immediately apologized afterwards.  While reckless, Mr. Gundersen's act was not motivated by either group's status. Therefore, subsections (a) and (b) do not apply.

### E.  Application of the Sentencing Factors

**A. Mr. Gundersen's history and characteristics demonstrate that a time-served sentence is appropriate.**

Mr. Gundersen's lifelong struggle ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████.

It is easy to forget how disruptive the COVID-19 pandemic was in the year leading up to January 6th.  For Mr. Gundersen, those disruptions had very real consequences.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

On online forums, he found it easy to espouse his mother's conservative (and sometimes extreme) views and to draw positive feedback. Having lived a life of social rejection and isolation, these interactions were illogically valuable to him and it caused him to involve himself further. When Donald Trump said that the election was stolen from him, Mr. Gundersen's involvement in the internet community and in election falsehoods deepened. He attended the December Trump rally in D.C. and felt a sense of acceptance and community that he had always lacked.

Online, Mr. Gundersen is smart and not awkward. Online, he knew how to draw reactions and feedback, giving him a sense of belonging that he lacked throughout his life. [redacted]

[redacted]

[redacted]



At 28 years old, Mr. Gundersen has no significant criminal history and his Criminal History Score is I.  He has been entirely compliant on pretrial ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████

## B. The nature and circumstances of Mr. Gundersen's offense do not warrant a prison sentence.

After the presidential election, former President Trump, members of his inner circle, and some members of the media began circulating the word that the election was "stolen." The now known to be false claims spread on media—from local Texas news outlets, to Facebook, to some national broadcasts—that the election had been corrupted.[7] Hearing these reports, Mr. Gundersen and his mother became concerned.

---

[7] For example, one news source stated that Texans should be wary of voting by mail in the 2020 election because mail-in ballots are "ripe for fraud and abuse." Robert Montoya, *Are Texas Elections Secure?*, TEXAS SCORECARD (Nov. 6, 2020), https://texasscorecard.com/state/are-texas-elections-secure/. *See, e.g.,* Tucker Higgins & Kevin Breuninger, *Texas sues for battleground states in Supreme Court over 'unlawful election results' in 2020 presidential race*, CNBC (Dec. 9, 2020), https://www.cnbc.com/texas-sues-four-battleground-states-in-supreme-court-over-unlawful-election-results.html (reporting on Texas lawsuit filed after 2020 election which argued that election results in Pennsylvania, Georgia, Wisconsin, and Michigan . . . should be declared unconstitutional based on the states' use of COVID pandemic to change their election outcomes); Donald Trump (@realDonaldTrump), TWITTER, (Dec. 9, 2020, 8:39 AM), https://twitter.com/realDonaldTrump/status/trump-tweets-his-campaign-will-join-paxsons-election-suit (Mr. Trump tweeted in support of the above Texas lawsuit contesting the election results in battleground states, stating that the lawsuit was "very strong, [with] ALL CRITERIA MET. How can you have a presidency when a vast majority think the election was RIGGED?"); Kate McGee, *Texas_Republicans*

They believed—because of what the President and other prominent politicians and media figures were saying—that the democratic process had been undermined by fraud. When President Trump started advertising the "Stop the Steal" rally, the family, including David, his mother, an aunt and an uncle, started a text chain to plan travel to Washington, D.C., to support the President and to protest against election irregularities.

Mr. Gundersen and his mother attended the first rally in Washington D.C. and Mr. Gundersen enjoyed the camaraderie that he experienced. When President Trump announced a second rally, he was excited to attend.

While Mr. Gundersen's messages after January 6th tell a story, those messages are consistent with an online persona desperate for positive feedback. To be clear, Mr. Gundersen did believe the election was stolen and recognizes that this is his own fault. But at the time, he fed off the online community that was eager to support the President and to advocate—in the form of his physical presence at a peaceful protest against election fraud.

███████████████████████████████████████████

███████████████████████████████████████████

_decline to condemn President Trump's premature declaration of victory while votes are still being counted_, THE TEXAS TRIBUNE (Nov. 4, 2020), https://www.texastribune.org/texas-republicans-trump/ (reporting how many Texas republicans, including Senator Ted Cruz, Senator John Cornyn, and Governor Greg Abbott, were silent on the matter of "Donald Trump prematurely and falsely [declaring victory]" in the 2020 election and U.S. Rep. Jodey Arrington stating that "there are legitimate concerns regarding the potential for fraud [in the election] that must be addressed in order for the country to move forward").



[redacted]

[redacted]

[redacted] On January 6th, nearly everyone was "over their heads." There was chanting and shouting, sirens blaring, individuals acting destructively and others acting with rage and violence. Mr. Gundersen's initial response, when he was waiting on the Ellipse, was to play video games on his Nintendo Switch. But when he was surrounded by loud and boisterous insurrectionist, he was unable to make the proper choices. And as he had been separated from his mother, he had no one to guide him. [redacted]



" Exh. A at 23.

## C. Incarceration is not appropriate for Mr. Gundersen

For many of the same reasons, a sentence of incarceration is not appropriate for Mr. Gundersen.

Following his sentence, Mr. Gundersen will continue to be monitored on supervised release with restitution obligations, which, to be clear, are in and of themselves forms of punishment. *See Mont v. United States*, 139 S. Ct. 1826, 1834 (2019) ("Supervised release is a form of *punishment* that Congress prescribes along with a term of imprisonment as part of the same sentence.") (emphasis added); *United States v. Haymond*, 139 S. Ct. 2369, 2380 n. 5 (2019) ("[T]he sword of Damocles hangs over a defendant every time he wakes up to serve a day of supervised release."); *Gall*

*v. United States*, 128 S. Ct. 586, 595-96 (2007) (noting that even a non-custodial sentence imposes serious restrictions on one's liberty and constitutes punishment, not a "free pass"); *see also United States v. Cohen*, 459 F.3d 490, 496 (4th Cir. 2006) ("[R]estitution is [...] part of the criminal defendant's sentence.").

Moreover, the Court should consider the severe collateral consequences that attach to Mr. Gundersen's convictions in assessing whether the sentence meets the directives of 3553(a) to impose a sentence that constitutes a just punishment and constitutes adequate deterrence.   Mr. Gundersen's arrest was widely published in his local news and Mr. Gundersen has not been able to obtain employment despite his many efforts. ███████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████

The collateral consequences that attend to Mr. Gundersen's felony conviction are substantial. District judges have recognized the life-long, damaging impact of a felony conviction can be relevant to sentencing. For example, in another January 6 case, the Honorable Amit P. Mehta observed

> People are all very quick to suggest that the only real punishment is a jail sentence, and it's just not true. People can suffer in many different ways and do suffer in many different ways a result of their conduct and that is something every judge, at least on this court, I believe,

understands, and takes into account when they're fashioning the appropriate sentence.[8]

Similarly, in imposing a variant probationary sentence, Judge Frederic Block of the Eastern District of New York issued a written opinion on the relevance of collateral consequences to his sentencing determination and urged that judges "consider such consequences in rendering a lawful sentence." *United States v. Nesbeth*, 188 F. Supp.3d 179 (E.D.N.Y. 2016). Judge Block wrote:

> There is a broad range of collateral consequences that serve no useful function other than to further punish criminal defendants after they have completed their court-imposed sentences. Many—under both federal and state law—attach automatically upon a defendant's conviction. The effects of these collateral consequences can be devastating. … Myriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These restrictions amount to a form of civil death and send the unequivocal message that "they" are no longer part of "us."

188 F. Supp. at 3d at 179 *(*internal quotations, alterations, and citations omitted*)*. In *Nesbeth*, the defendant was also a first offender, convicted of importation of drugs. Though that defendant's guideline range was 33-41 months, Judge Block "rendered a nonincarceratory sentence. . . in part because of the number of statutory and regulatory collateral consequences in balancing the 18 U.S.C. § 3335(a) factors." *Id.* at 180. *See also United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) (despite guidelines of 78-97 months, district judge imposed sentence of twenty months in part because conviction "made it doubtful that the defendant could pursue his career as

---

[8]*United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at pg. 29.

an academic or translator, and therefore that the need for further deterrence and protection of the public is lessened because the conviction itself already visits a substantial punishment on the defendant"); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (loss of the defendant's "teaching certificate and his state pension as a result of his conduct" is appropriate sentencing consideration consistent with requirement that "the sentence reflect the need for just punishment and adequate deterrence").

The collateral consequences that Mr. Gundersen has already experienced and will continue to experience are severe and should be considered by this Court in assessing what would constitute a "just punishment" and "adequate deterrence." First, Mr. Gundersen lost his job and has struggled to regain employment.  Second, his right to vote is revoked.[9] This is a particularly painful consequence to him as he always enjoyed the excitement voting on Election Day.  These long-lasting and irreversible consequences, in addition to a sentence of time-served, restitution, and a period of supervision are sufficient to meet the goals of 3553(a).

With respect to deterrence, it is often presumed that incarceration is necessary to achieve deterrence, and that the more incarceration imposed, the greater the deterrent effect. However, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[10] In short,

---

[9] https://www.usvotefoundation.org/voting-rights-restoration/texas.
[10] Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28 (2006) ("Three National Academy of Science panels . . . reached that conclusion, as

there is little empirical support for the prospect that a period of confinement will be any more effective at deterring Mr. Gundersen or others from committing this offense. And, indeed, the most effective deterrent is the certainty of punishment, not the severity of punishment. *See, e.g.*, *United States v. Bannister*, 786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011) ("[G]iven that effective deterrence arises from certainty, not harshness, of punishment, our society might better consider whether our scarce resources would be better spent, not on extended incarceration, but on eliminating social conditions encouraging crime and on non-incarceratory techniques").

i.    *A sentence of time-served avoids unwarranted disparities.*

Mr. Gundersen did not injure anyone. While it was reckless to jump into a riot shield, he did not act in a manner that reasonably could have injured anyone. In fact, when an officer dropped their riot shield, Mr. Gundersen did not attempt to assault

---

has every major survey of the evidence."); *see also* National Institute of Justice, *Five Things About Deterrence*, at 1 (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf (stating, among other things, that "[i]ncreasing the severity of punishment does little to deter crime," and "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment"); Ellen Raaijmakers *et al.*, *Exploring the Relationship Between Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected Element in Testing Deterrence Theory*, 54 J. OF RSCH. IN CRIME AND DELINQ. 1, 4 (2017) ("[T]he available evidence points toward a null or a slightly criminogenic effect of imprisonment but has rarely found support for a clear specific deterrent effect."); Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 CRIME & JUST. 199, 201 (2013) ("[T]here is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that reoffending is either unaffected or increased."); Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity").

the officer – instead he turned around and left.  A prison sentence that will remove

Mr. Gundersen from ██████████████ the community and lock him away for years

is not warranted and will create vast disparity with other cases involving similar

conduct.

More importantly, Mr. Gundersen presents a unique set of mental health

issues that have not been presented in other cases.  However, it is helpful to consider

*United States v. Matthew Wood*, 21-cr-223 (APM), where Judge Mehta sentenced the

defendant to probation.

Mr. Wood pleaded guilty to all charges in the Indictment of which the lead

charge was 18 U.S.C. § 1512(c)(1). Like Mr. Gundersen, the PSR applied the 8 and 3-

level enhancements under U.S.S.G. §2J1.2(b)(1)(B) and §(b)(2), respectively. Gov.

Sentencing Memo, ECF. No. 55 at 47. The government requested a sentence of 57

months based on its guidelines calculation of 51 to 63 months.

Judge Mehta declined to apply the eight-level enhancement under Section

2J1.2(b)(2) despite evidence that Wood boasted about fighting police and "storming"

the Capitol in messages to others such as: "We sent congress running into their escape

tunnels," and "We just stormed the Capitol, we are busting into house chambers,"

"We busted the windows out." Wood falsely told a friend, "I am fighting capitol police."

According to the government, Wood was also part of a group that "terrorized" staffers

present in House Speaker's suite of offices."[11] Judge Mehta did apply the 2-level

---

[11] ECF. No. 55 at 51.

enhancement for obstruction. Ultimately, Judge Mehta imposed a sentence of one year of home detention.

Mr. Wood's conduct is similar to how the government characterizes Mr. Gundersen's conduct and the sentence imposed on Mr. Wood supports Mr. Gundersen's request. Indeed, the government sentencing memos in both Mr. Wood and Mr. Gundersen's case contain similar hyperbole and at times portray the men as dangerous seditionists rather than what they truly were: vulnerable individuals in deep distress—and for Mr. Gundersen, mental and emotional distress.  It is beyond dispute that vulnerable individuals like Mr. Gundersen had been fed lies by other the President of the United States (and other powerful people) arguing that democracy was at stake, that their vote had been stolen, and that it was up to them to stand up for the "true President."[12] Some similarities between Mr. Wood and Mr. Gundersen's admitted conduct are:

- Prior to January 6, Mr. Wood, like Mr. Gundersen, made blustering comments about January 6. Specifically, Mr. Wood messaged comments such as January 6 "is going to be wild" and that he was "down for whatever

---

[12] According to Representative Liz Cheney, Vice Chair of the House Select Committee investigating January 6,"President Trump invested millions of dollars of campaign funds purposely spreading false information, running ads he knew were false, and convincing millions of Americans that the election was corrupt and that he was the true President." *See* https://www.npr.org/2022/06/10/1104156949/jan-6-committeehearing-transcript.

they want to do!" He also boasted that he was prepared to "raid Congress" and "be brave heart in that bitch."[13]

- Mr. Wood climbed the media tower and "encouraged others forward." According to the government, he incited others to violence.[14]

- Like Mr. Gundersen, Mr. Wood entered through a broken window.[15] Unlike Mr. Reid, however, he pursued police officers, including Officer Eugene Goodman upstairs to the Ohio Clock corridor.

- Mr. Wood went from the Ohio Clock corridor to the House Chamber and told others that he and "just broke through Capitol police" (among other blustery comments).

- According to the government, Mr. Wood pushed against police officers; Mr. Gundersen jumped into the riot shield of an officer;

- Wood was in the Capitol for a total of 80 minutes.[16]

- Mr. Wood deleted his Facebook account after January 6 and urged an individual whom he has messaged to delete their conversation.

- Mr. Wood climbed scaffolding and waived his arms and yelled.  Like Mr. Gundersen, he encouraged protestors forward.[17]

- Mr. Wood entered the Speaker's suite and took video of his antics there, including taking a drink of water from a glass sitting on a table. According

---

[13] Id. at 1-3.
[14] ECF. No. 55 at 3.
[15] Id. at 4
[16] Id. at 4
[17] Id. at 22

to the government, he was part of a group that "terrorized" the staffers in the Speaker's suite.[18] Video captures Wood yelling, "Madam Speaker, we want to have a word with you!" and "Here's Johnny!." Mr. Gundersen also entered the suite and wrote a sarcastic note.

- Mr. Wood made his way to the Rotunda, where police officers began forcing people to leave. He refused to leave and instead assisted other protestors pushing against police.[19]  Mr. Gundersen reentered the Capitol after being asked to leave.

- After January 6, Mr. Wood uploaded his pictures to social media with messages such as "We sent those politicians running."[20]  Mr. Gundersen made similar comments on social

- Like Mr. Gundersen, Mr. Wood traveled to January 6 with a family member who did not enter the Capitol.

- Like Mr. Gundersen, Mr. Wood wore regular "street" clothing—no combat or military gear. Like Mr. Gundersen, Mr. Wood did not bring weapons, though he boasted of using "guns" in his messages.

- Like Mr. Gundersen, Wood was not affiliated with an extremist organization.

---

[18] Id. at 28
[19] Id. at 38.
[20] Id. at 55.

28

For this conduct, the government requested a sentence of 57 months for Mr. Wood. After declining to impose the 8-level enhancement, Judge Mehta imposed no prison time.

1.  Similarly situated January 6 cases

While the Justice Department unquestionably treats January 6 defendants harsher than any other category of defendants arrested in connection with aggressive, disruptive political protests,[21] even when compared to sentences imposed in January 6 cases, it is apparent that a sentence of time-served is appropriate for Mr. Gundersen. For example, in a recently concluded case in which the defendant was convicted of physically striking a police officer on January 6, *United States v. Sargent*, the Honorable Thomas Hogan imposed a sentence of 14 months. In addition to hitting an officer with his hand, that defendant recorded the scene on social media while boasting, "we got a clash of police going. . . Shit's getting fucking rowdy out here now. We got flash bangs."[22] After striking one officer, Sargent tried to strike another officer, but instead made contact with another protestor.  At one point, that defendant

---

[21] Indeed, protestors who flooded into the Senate Atrium to protest Justice Kavanaugh's confirmation hearings after U.S. Capitol Police barricaded the front of Capitol were charged with misdemeanors, the vast majority of which were resolved by deferred prosecution agreement and nominal fines in Superior Court. Certainly, the Justice Department declined to wield the federal felony obstruction of justice statute against *those* protestors, though their conduct seemed inarguably designed to, and did, disrupt an official proceeding. *See* Jason Breslow, *The Resistance at the Kavanaugh Hearings: More than 200 arrests*, NATIONAL PUBLIC RADIO, September 8, 2018 (reporting that most of the over 200 Kavanaugh demonstrators arrested were charged with disorderly conduct or crowding and ordered to pay fines of $35 or $50).
[22] *United States v. Troy Sargent*, 1:21CR258(TFH), Gov. Sentencing Memo, ECF. No. 70.

bragged that he "duffed an officer in the face." He also told officers "fuck you guys, you guys are either with them or with us."[23] By contrast, Mr. Gundersen did not injure any police officer. He did not yell abusive and threatening language towards police officers and he did not attempt to go inside the Capitol. These factors militate in favor of a sentence below that imposed on defendant Sargent.

In another January 6 assault on-a-federal-officers case, the Honorable Amy Berman Jackson imposed a 6-month sentence on a 57-year-old veteran who chanted at officers standing before him to "join us." When two officers tried to repel Mr. Leffingwell and the crowd around him, he struck both officers in the head.[24] Despite his physical assault of two officers, Judge Berman Jackson imposed a sentence of six months. In another case involving assaultive conduct, the Honorable Paul Friedman imposed a sentence of five months on January 6 defendant who, while carrying a large Confederate flag and a backpack with a knife and duct tape in, pushed a large lacrosse stick against a police officer's chest while yelling that he would not submit to commands.[25] Again, these cases demonstrates that a sentence of 45 days followed by supervised release is appropriate for Mr. Gundersen, who did not strike or injure any officers.

F.   A downward departure is otherwise appropriate

The Court should depart from the sentencing guideline range to a sentence of probation pursuant to USSG §5H1.3 as identified by the probation office.   ■

---

[23] *Id.*
[24] *United States v. Leffingwell,* 1:21CR5 (ABJ), ECF. No. 4.
[25] *United States v. David Blair*, 1:21CR186 (PLD), ECF. No. 55.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

**Conclusion**

Brian Gundersen admitted to, and feels ashamed for, the crimes that he committed. But unlike many others, we know why Mr. Gundersen found himself involved in January 6th. ████████████████████████████████████████████

████████████████████████████ Counsel thus recommends a sentence that is sufficient and not more than necessary is one that avoids additional active incarceration and that restrains Mr. Gundersen's freedoms of movement and choices in the community, with the clear message that any errors on his part can result in a revocation of his supervision and a return to the loss of his freedom and a prospective lengthy sentence of imprisonment.

Respectfully Submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
EUGENE OHM
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500